

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

AUG 1 6 2004

CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

EDWARD P. MANTURUK,

       Plaintiff,

-vs-

MIDLAND NATIONAL LIFE
INSURANCE COMPANY, ALLIANZ
LIFE INSURANCE COMPANY OF
NORTH AMERICA, JAMES R. CHAFFEE,
and CHAFFEE AND ASSOCIATES,

       Defendants.
_____/

CASE NO. 02-73905

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE



## <u>OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION TO ENFORCE ORAL SETTLEMENT AGREEMENT; AND (2) DISMISSING CASE WITH PREJUDICE</u>

On December 10, 2003, Defendants filed a Motion to Enforce Oral Settlement

Agreements. On January 27, 2004, after Plaintiff had not filed a response thereto, the Court

ordered Plaintiff to show cause why the motion should not be granted. After receiving no

response to the show cause order, the Court set a hearing on the motion for March 17, 2004. On

March 16, 2004, one day before the hearing and several weeks after the deadline for responding

to the show cause order, Plaintiff submitted his response. Counsel for Plaintiff appeared at the

March 17, 2004 hearing and was permitted to contest Defendants' motion. Plaintiff's counsel

stated on the record that a settlement had been reached with Defendant Midland National Life

1

Insurance Company ("Midland"), and that Midland should be dismissed.  (Transcript of March 17, 2004 hearing (hereinafter "3/17 Tr."), pp. 31-32).  The Court entered an order to that effect on March 29, 2004.[1]

At the close of the March 17, 2004 hearing, the Court, based upon the United States Court of Appeals for the Sixth Circuit's decision in *Kukla v. National Distillers Products Co.,* 483 F.2d 619, 621 (6th Cir. 1973), ordered the parties to appear on May 10, 2004 for an evidentiary hearing, at which the Court would make findings of fact as to whether settlement was reached.  On May 10, 2004 and May 11, 2004, the Court conducted the evidentiary hearing; testimony was heard from the following witnesses:

(1)     Russell Hoover, counsel for Defendant Midland;

(2)     John Sheran, counsel for Defendant Allianz Life Insurance Company of North America ("Allianz");

(3)     David Zuppke, counsel for Defendants James R. Chaffee and Chaffee and Associates (the "Chaffee Defendants"); and

(4)     Eugenia Zacks-Carney, counsel for Plaintiff.

After the close of testimony on May 11, 2004, the Court ordered the parties to submit post-hearing briefs within two weeks of receiving the hearing transcript.  On June 28, 2004, Defendants Allianz and Chaffee submitted their closing brief; on July 1, 2004, Plaintiff

---

[1]Pursuant to counsel for Midland's request, the Court entered an Amended Order on April 5, 2004, dismissing the case against Midland with prejudice.

submitted his closing brief.

## CONTROLLING LAW

Agreements settling litigation are "solemn undertakings, invoking a duty upon the involved lawyers, as officers of the court, to make every reasonable effort to see that the agreed terms are fully and timely carried out." *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1972). "It is well established that courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them." *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988)(quoting *Aro Corp.*, 531 F.2d at 1371). The power of a trial court to enforce a settlement agreement "has its basis in the policy favoring the settlement of disputes and the avoidance of costly and time-consuming litigation." *Kukla,* 483 F.2d at 621(citing *Massachusetts Casualty Ins. Co. v. Forman*, 469 F.2d 259, 261 (5th Cir. 1972)). To effectuate this policy, "the power of a trial court to enforce a settlement agreement has been upheld even where the agreement has not been arrived at in the presence of the court nor reduced to writing." *Id.* (citing *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3rd Cir. 1970)).

Before enforcing a settlement, the district court must conclude that agreement has been reached on all material terms. *Brock*, 841 F.2d at 154 (citing *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983)). The court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement. *Id.* (citing *In re Air Crash Disaster at John F.*

3

*Kennedy International Airport,* 687 F.2d 626, 629 (2nd Cir. 1982)). However, "where material

facts concerning the existence of an agreement to settle are in dispute, the entry of an order

enforcing an alleged settlement agreement without a plenary hearing is improper." *Kukla,* 483

F.2d at 622 (quoting *Forman,* 469 F.2d at 260). *See also Michigan Regional Council of*

*Carpenters v. New Century Bancorp, Inc.,* 2004 WL 771255, at \*5 (6th Cir. April 13,

2004)(quoting *Re/Max Int'l, Inc. v. Realty One, Inc.,* 271 F.3d 633, 646 (6th Cir.

2001)("Ordinarily, an evidentiary hearing is required where facts material to an agreement are

disputed."))(unpublished opinion).

 Settlement agreements are a type of contract and are therefore governed by contract law.

*Bamerilease Capital Corp. v. Nearburg,* 958 F.2d 150, 152 (6th Cir. 1992)(citing *Hageman v.*

*Signal L.P. Gas, Inc.,* 486 F.2d 479, 487 (6th Cir. 1973)). Accordingly, "[w]hether [a settlement

agreement] is a valid contract between the parties is determined by reference to state substantive

law governing contracts generally." *Id.* (quoting *White Farm Equipment Co. v. Kupcho,* 792

F.2d 526, 529 (5th Cir. 1986)).

 Michigan courts have adopted the Sixth Circuit's holding in *Capital Dredge and Dock*

*Corp. v. v. City of Detroit,* 800 F.2d 525, 530-31 (6th Cir. 1986):

> Generally, when a client hires an attorney and holds him out as counsel
> representing him in a matter, the client clothes the attorney with apparent
> authority to settle claims connected with the matter. [citations omitted]. Thus, a
> third party who reaches a settlement agreement with an attorney employed to
> represent his client in regard to the settled claim is generally entitled to
> enforcement of the settlement agreement even if the attorney was acting contrary

4

> to the client's express instructions. In such a situation, the client's remedy is to
> sue his attorney for professional malpractice. The third party may rely on the
> attorney's apparent authority unless he has reason to believe that the attorney has
> no authority to negotiate a settlement.

*See Nelson v. Consumers Power Co.*, 198 Mich. App. 82, 89-90 (1993)(quoting and adopting *Capital Dredge* rule). But for this rule of law, "prudent litigants could not rely on opposing counsel's representation of authorization to settle. Fear of a later claim that counsel lacked authority to settle would require litigants to go behind counsel to the opposing party in order to verify authorization for every settlement offer." *Id.* at 89 (quoting *Capital Dredge*, 800 F.2d at 532). With these rules of law as guidance, the Court now turns to its findings of fact resulting from the May 10, 2004 hearing.

## **FACTS**

The Court had the opportunity to hear testimony from, and judge the credibility of all counsel. From its review of the record and the testimony provided, the Court makes the following findings of fact:

The deposition of Edward Manturuk was scheduled to begin on October 30, 2003, in the office of David Zuppke, counsel for the Chaffee Defendants. On October 29, 2003, Eugenia Zacks-Carney, counsel for Plaintiff, sent a settlement offer via e-mail to Russell Hoover, counsel for Midland. The October 29, 2003 offer stated, *inter alia*:

5

> I spoke with Mr. Manturuk about continuing settlement efforts with [Midland].
> Would [Midland] simply consider reformation of the existing annuities to reflect
> Mr. Manturuk as the annuitan[t] – as an exclusive point of settlement?  In other
> words, in exchange for dismissing [Midland], we leave everything else "as is" –
> surrender charges, pay out periods, interest rates, identity of policy owner, free-
> look back period, etc.?  This is a tremendously reasonable position and I hope
> [Midland] will take it seriously.

(Exhibits in Support of Defendants' Post-hearing Brief, Ex. DX 3).  Mr. Hoover did not receive

the e-mail offer until the morning of October 30, 2003, when he arrived for the scheduled

deposition.

Mr. Hoover, upon receiving the offer, engaged in a brief discussion with Ms. Zacks-

Carney:

> I said this appears to be a very fair offer.  Do I understand correctly that the only
> thing that Midland has to do is change the annuitants on the 1997 policies?  That's
> it, correct?  She said, that's it, correct.
> I then asked her whether it was Mr. Manturuk's position that those policies were
> mistaken, that he intended something different when the policies issued in the first
> place.  She confirmed that was the case.
> I then said – I reminded her that I made clear in the past that any dismissal of
> Midland pursuant to a settlement, would have to include dismissal of Mr. Chaffee
> and the claims against Chaffee insofar as they relate to Midland.  Midland would
> insist on that as a condition of any settlement, and that I reminded her that I told
> her that before.  She acknowledged that I told her that before, and she agreed that
> would be the case here, that the Midland piece of the case against Chaffee would
> be dismissed as well.

(Transcript of May 10, 2004 Evidentiary Hearing (hereinafter "5/10 Tr."), pp. 25-26).  Mr.

Hoover then excused himself to place a telephone call to his client, to check and see if the

annuitants could be changed without their approval.

6

·

After conferring with Steven Horvath of Midland, Mr. Hoover returned and said to Ms. Zacks-Carney "we got a deal." (5.10 Tr., p. 27). Mr. Hoover then stated that "since [the settlement] involved a dismissal of Mr. Chaffee, at least in part as well, I want you to come into Mr. Zuppke's office and confirm to him the settlement that we have just reached. I will not go forward with the deposition obviously since we now reached this settlement." (5/10 Tr., p. 27). Mr. Hoover and Ms. Zacks-Carney proceeded into Mr. Zuppke's office and informed Mr. Zuppke of the terms of the settlement agreement.

At approximately 10:00 a.m., Mr. Sheran, counsel for Allianz, arrived at Mr. Zuppke's office. Upon his arrival, Mr. Sheran was informed of the settlement agreement between Midland and Plaintiff. Ms. Zacks-Carney testified:

> At that point I wouldn't call it a settlement discussion. I think we had settlement, that would be Mr. Hoover and myself as to that exclusive point, and what Mr. Sheran joined was a group of people talking about how could we take this one step further. So when Mr. Sheran arrived, basically either Mr. Zuppke or Mr. Hoover relayed what had transpired so far in his absence.

(Transcript of May 11, 2004 Evidentiary Hearing, (hereinafter "5/11 Tr."), p. 26). Mr. Hoover informed Mr. Sheran that Plaintiff was open to discussing a possible settlement with Allianz. Plaintiff and Ms. Zacks-Carney then left Mr. Zuppke's office and went to a cafeteria to work on calculations "that ultimately led to the presentation [of] the demand on their part sometime after lunch." (5/10 Tr., p. 143). Plaintiff made an initial settlement offer of "$69,000 or $70,000." (5/10 Tr., p. 145). Mr. Sheran called Carolyn Cosgrove of Allianz and relayed Plaintiff's

settlement offer. The offer was rejected, and Mr. Sheran obtained authority to settle the claim for

up to $15,000:

> So with that, I made an offer that was couched in terms that we would pay
> $15,000 to settle any involvement of Allianz Life Insurance Company of North
> America policies, which include Mr. Chaffee's involvement for $15,000 in
> exchange for a full release and dismissal with prejudice. That offer was extended
> to Mr. Manturuk and to Ms. Zacks-Carney. They talked about it for awhile, and
> came back and indicated that they were not willing to settle on that basis.

(5/10 Tr., p. 146).

At that point, Mr. Manturuk returned to the deposition room, put on his microphone and

prepared to begin the deposition. Before the deposition began, Mr. Chaffee indicated that he

would be willing to contribute $5,000 to settle the case for a total of $20,000. Mr. Sheran

relayed this offer to Plaintiff. Mr. Sheran testified:

> I don't recall a specific rejection of that offer, but it was clear they were not totally
> satisfied with that figure, although it seemed to have resulted in a little more
> interest [than] the previous [offer], but what intervened was as I recall, Mr.
> Chaffee asked if it would be all right for him – and I can't remember whether Mr.
> Manturuk asked him to do this, or he suggested to do this – but he asked if [it]
> would be all right for him to talk to Mr. Manturuk directly about the settlement
> and explain to him how the annuities worked and things like that.
> * * *
> I'm sure with the agreement of counsel, it was agreed that Mr. Chaffee could go
> and talk to Mr. Manturuk, and he did, and Mr. Chaffee came back to me, maybe a
> half hour later, and told me the case could settle if my client would be willing to
> accelerate the annuity provisions on the annuities, and to change the identity of the
> annuitants and beneficiaries on six policies that Mr. Manturuk had which
> identified his grandchildren and Ms. Zacks-Carney's children as beneficiaries.

(5/10 Tr., pp. 148-49). Mr. Sheran telephoned his client, and was informed that Allianz would

8

be willing to accept those terms.  Mr. Sheran "advised Mr. Manturuk that we would be willing to

do that, and with that we had a gathering of everyone that was involved, again in the same

conference room, to talk about the details of the settlement."  (5/10 Tr., p. 149).  The parties

agreed that the only thing left to be resolved was what option Mr. Manturuk would select to

receive the annuitized value.[2]  Mr. Sheran did not have the current annuitized values with him

and, since it was late in the day, was unable to obtain them.  The parties agreed to return the next

day, at which point Mr. Sheran would present the current annuitized values to Mr. Manturuk.

    Mr. Sheran testified that, at the end of the day, the following events occurred:

Q.     Did you make it clear that Mr. Chaffee would be released as part of this settlement?

A.     Yes.

Q.     Did you communicate that clearly to Mrs. Zacks-Carney?

A.     Yes.

Q.     Did you do that in front of her client?

A.     Yes.

Q.     Did either of them make any objections to a dismissal and release of Mr. Chaffee?

A.     No.

Q.     Did they confirm that Mr. Chaffee would be released?

A.     It was confirmed that everyone was being released.

Q.     And that was said out in front of everybody?

A.     Yes, and we shook on it, and I believe it was suggested that we make a record of it that night.  I think the court reporter might still have been there.  Ms. Zacks-Carney said that she wanted to write it up the following day when we had this additional information, and either I said or Mr. Hoover said or [Mr. Zuppke] said, we don't want to leave here without

---

[2]Mr. Sheran testified: "There are probably seven different options that are available under the policy.  Certainly any one of them would be available to Mr. Manturuk, but we only discussed that evening two, a 10 year pay out, and a guaranteed life pay out."  (5/10 Tr., p. 151).

knowing that we have the case settled, and she said, my word is good.

(5/10 Tr., pp. 152-53).  Ms. Zacks-Carney also testified that she told opposing counsel that her

word was good.  (5/11 Tr., p. 70).  Ms. Zacks-Carney proposed to write up a settlement

agreement regarding her settlement with Midland, and e-mail it to Mr. Hoover.  The parties then

adjourned the scheduled deposition, agreeing to return the next day to provide Mr. Manturuk

with the current annuitized values of the Allianz policies.  Defense counsel testified that they

went to dinner to celebrate the settlement of this case.

That evening, Ms. Zacks-Carney e-mailed a "draft" settlement agreement to Mr. Hoover.

The agreement stated, *inter alia*:

   A.   Plaintiff shall cause [Midland] to be dismissed with prejudice as a party
        from the Civil Action by filing the appropriate motion with the court...
   B.   [Midland] shall cause to be issued to Plaintiff a set of reformed annuity
        policies... formerly bearing various annuitant and owner names and now to
        be reformed to bear only the name "Edward P. Manturuk" as "Annuitant"
        and "TCE SYSTEMS, INC.," as "Owner".

(Defendant's Ex. DX 4, p. 3).  The agreement also contained provisions relating to the waiver of

surrender charges and to the release of Mr. Chaffee, which stated: "This Release specifically

excludes a release of James R. Chaffee acting in his individual capacity or as an agent for any

company other than [Midland], its parents, and affiliates."  (Id., p. 4).  Mr. Hoover testified that

the proposed written agreement was not acceptable:

   In part, it was exactly contrary to what her October 29th offer had been.  The
   October 29th offer had been that the only thing that was changed was the
   annuitants on the three policies.  Everything stays as is – her words – including the

10

identity of the owner of the policy, and the surrender charges of the policies. The draft settlement agreement did the opposite. It proposed that Midland issue new policies, new 1997 policies showing the owner to be Mr. Manturuk's corporation TCE, and waving surrender charges on the 2001 policies for future surrender on those policies, which was absolutely contrary to what we agreed.

(5/10 Tr., pp. 34-35). Mr. Hoover telephoned Ms. Zacks-Carney "almost right away," and explained to her why the proposed agreement was unacceptable. (5/10 Tr., p. 36).

On October 31, 2003, Messrs. Chaffee, Hoover, Sheran, and Zuppke convened in Mr. Zuppke's office at approximately 9:30 a.m. Ms. Zacks-Carney and Plaintiff did not physically appear at Mr. Zuppke's office; Ms. Zacks-Carney mad herself available by telephone. Ms. Zacks-Carney told Mr. Hoover that she wanted Midland to issue a new policy, rather than simply change the annuitants retroactively. Mr. Hoover explained that Midland was unable to issue a "new" policy; the annuitants could be changed retroactive to the date of issue, but a "new" policy could not be issued. Mr. Hoover and Ms. Zacks-Carney had several conversations throughout the day on October 31, 2003, with Mr. Hoover indicating to Ms. Zacks-Carney that he expected her to live up to the agreement reached on the previous day.

With regard to the settlement between Allianz and Plaintiff, the Court heard the following pertinent testimony from Mr. Sheran:

> Q.    Did you show up at [Mr. Zuppke's] office?
> A.    Yes.
> Q.    What happened there?
> A.    Mr. Hoover told me that problems had come up with the way in which Ms. Zacks-Carney had proposed the settlement to him in some draft agreement that she sent to him the evening before, but I saw my deal as a separate

11

> deal from Midland, and I continued to feel that I was going to go forward
> and get my case settled regardless of what happened to Midland, and so I
> contacted my client Allianz Life and had them send me some additional
> figures, those that were requested the evening before. If I remember
> correctly, what was sent was the current annuitized value, the surrender
> value, the cash surrender value, and yearly numbers for annual payments
> on a 10 year annuitized basis, and either a life basis or life with 10 years
> guaranteed. Two options. Those had been discussed previous night were
> sent by a woman by the name of Ms. Loie Masuga... She was a paralegal
> at Allianz.

Q.    What happened next?

A.    I recall that we got this information on your fax machine, and it had that
      kind of oniony paper that curled up, and so it was difficult to pass along.
      So I called Ms. Zacks-Carney and gave her the information over the
      telephone. Mr. Chaffee added up all the policies, the annual payments that
      each of the payments would provide so he could figure out what his annual
      income would be from the annuity payments in each of the two options,
      and that information was conveyed over the telephone to Ms. Zacks-
      Carney.

Q.    While you were conveying this information, was Ms. Zacks-Carney still
      telling you that you had a deal?

A.    Yes. What I expected is that I would give her this information; that
      simultaneously I would be getting a call back, or very shortly after that I
      would be getting a call back with Mr. Manturuk saying, I'll take this one
      or that one, and there would be nothing more to do than to fill out the
      application.

(5/10 Tr., pp. 155-57). Mr. Manturuk did not make a selection on October 31, 2003. Mr.

Manturuk thereafter retained a tax analyst to assist him; however, to date, he has not made a

selection.

When it was clear that conversations between the parties were not leading to a resolution,

Messrs. Zuppke, Hoover, and Sheran, at the end of the day on October 31, 2003, sent the

following letter to Ms. Zacks-Carney:

12

We spent approximately nine hours negotiating a settlement with Mr. Manturuk and yourself in lieu of starting your client's deposition. At 6:00 p.m., we reached a settlement that you refused to put on the record despite our court reporter and videographer's continued presence at the Defendants' "expense" in order to do just that.

The terms and conditions of the settlement were as follows:

**Midland**: Midland agreed to allow Mr. Manturuk to change the annuitants to reflect himself as the annuitant on the three annuity policies which he purchased in 1997 and which he has represented mistakenly listed his children as annuitants. This single change was the only consideration or, as you put it in a prior letter, "the exclusive point of settlement". You also agreed as part of the deal with Midland that Mr. Chaffee would be released as to all Midland related claims.

**Allianz:** Allianz agreed to allow the change of annuitants, at Mr. Manturuk's discretion, on six annuity policies. Additionally, Mr. Manturuk would be allowed to "annuitize" any or all outstanding policies with an early waiver of the applicable surrender changes for any such policy annuitized. Mr. Manturuk would retain the option to select a "lifetime" benefit without a guaranteed term or with a "term certain" guarantee. The actual figures were to be provided at the face-to-face meeting with you and your client scheduled at 9:30 a.m. this morning to finalize a written agreement incorporating these changes or to commence Mr. Manturuk's deposition. Mr. Chaffee was to receive a full, final and complete release of all claims by Mr. Manturuk upon execution of the Allianz agreement. Despite our urging to place the settlement on the record, you refused, indicating that your "word was good", and it would not be necessary to make a formal record.

This morning, instead of appearing at my office for the meeting, you e-mailed Mr. Hoover a proposed settlement as to Midland and Chaffee that went far beyond the agreed terms. Further, in your most recent telephone conversations with Mr. Hoover, you have likewise added numerous other conditions not a part of last night's settlement agreement.

We believe that we have reached enforceable agreements settling the outstanding issues between the parties. Please advise whether your client is still willing to abide by the agreed settlement terms reached last night or whether we need to address this matter with the Court. Be assured that, if we need to address this with the Court, we will be requesting all actual attorney fees incurred in connection with these two days of apparently wasted time and the costs of the court reporter and videographer.

Further, it was our intention to take your client's deposition this morning in the

13

event you client refused to go forward with the settlement; however his and your
failure to show up at the morning meeting has made that impossible.

(Defendant's Ex. DX 5)(emphasis in original). On November 3, 2003, Ms. Zacks-Carney sent a

response letter to Mr. Zuppke, which stated, *inter alia:*

3) Your reduction of the alleged terms of settlement in your letter, to a)
Midland's "single change", and b) Allianz's choice of only 2 options
("lifetime" or "term certain") of the seven (7) options (A-G) available
under each of the Allianz contracts, is a grossly [sic] oversimplification of
discussions.

4) **Midland**: While Mr. Hover [sic] suggested to place some settlement terms
reached with Midland only on a videotape recording designed for Mr.
Manturuk's deposition, I resisted as I did not want to be pigeon-holed into
partial settlement terms. Mr. Hoover agreed. The same night, I drafted a
draft settlement agreement and forwarded it that night to Mr. Hoover. I
would have benefited [sic] from a videotaped recording of terms, which
were rejected by [Midland] on Friday. The last stated settlement posture
to be considered with Midland boils down to: a) reformation with
surrender charges, or b) no reformation with partial (½) surrender charges
waived and complete withdrawal. We learned on Friday that the former
position – our hoped position – could not be had *ab initio* as a means of
enforcing the 10-day free look period to which my client should have been
entitled and as was originally contemplated on Thursday. That would have
sealed the deal for my client. My client was disappointed by this changed
position by [Midland] on Friday – but not sufficiently disappointed to stop
negotiations altogether. While my "word was good", Mr. Hoover could
not keep the deal. This is yet another fact not addressed in your purported
"enforceable agreements." Your letter does not address this limitation at
all.

5) **Allianz**: We were in an information-gathering mode with Allianz at the
end of the day on Thursday when Allianz retracted a $15,000 (plus $5,000
offer from Mr. Chaffee) and replaced it with an accelerated annuitization
set of options. I explained this to both you and Mr. Hoover again on
Friday morning while we were awaiting Mr. Sheran's arrival.

6) Per speakerphone discussions on Friday morning for purposes of
recapitulation, Mr. Hoover agreed with me that there were puzzle pieces

14

missing in the Allianz negotiations when we left on Thursday evening that
prevented a settlement record being made, even if we wanted to try. You
remained silent on this, which I understood to mean that your position did
not vary from the recollection of Mr. Hoover or myself.

(Defendants Ex. PX A)(emphasis in original).

Throughout the following weeks, Mr. Hoover and Ms. Zacks-Carney exchanged several

e-mail messages outlining their respective positions. On November 5, 2003, Mr. Hoover had a

telephone conversation with Ms. Zacks-Carney and Mr. Manturuk. Mr. Hoover testified:

Ms. Zacks-Carney called me on the 5th to ask in words of substance, whether or
not Midland would agree to allow her client to annuitize the Midland annuities in
the same way that she was discussing with [Mr. Sheran] regarding the Allianz
annuities; in other words, as a part of the Midland deal, Midland would agree to
allow annuitization with payment to be made to Mr. Manturuk regarding all of the
Midland policies.
I said I don't know, but my guess is that in order to divorce ourselves completely
from Mr. Manturuk, Midland would likely agree. Let's put our clients into the
call and find out. So I conferenced in – Ms. Zacks-Carney was calling me
someplace where Mr. Manturuk was with her, and I conferenced in Mr. Horvath,
and we went over this proposal, and the proposal would be to change the
annuitants on the 97 policies as we agreed back on October 30th, and as well, give
Mr. Manturuk the option to annuitize his Midland policies, and I think the first
suggestion was that he be given the option to do that for payments over 10 years,
or 11 payments over 10 years, something like that. That piece of the conversation
took place with Mr. Manturuk on the phone, Mr. Horvath on the phone, Ms.
Zacks-Carney and me all on the same phone call, and we agreed to that.

(5/10 Tr., pp. 44-45). Ms. Zacks-Carney requested that Mr. Hoover provide her with the

numerical values of the different annuitization options, just as Mr. Sheran had done. On

November 10, 2003, Mr. Hoover e-mailed the figures to Ms. Zacks-Carney and stated:

So, here are the elements of the new deal and no others. Correct?

15

    (1)    Mr. Manturuk will represent and warrant that the 1997 policies, nos.
             185,031 and 032, mistakenly listed his children rather than himself as
             annuitants, that he first became aware of the error in the summer of 2002
             when Mr. Chaffee gave him the policies and that he wants the policies
             corrected ab initio to reflect his original intent.

    (2)    Midland will prepare an amendment or other similar document for the
             1997 policies changing the annuitant as of the issue date of the policies to
             Edward P. Manturuk.

    (3)    Mr. Manturuk requests, and Midland agrees, that he annuitize the
             accumulation values of all 5 policies effective 11/15/03 in a way which
             will call for 11 equal payments of \$33,344.13 to be made to Mr. Manturuk
             or his successor in interest, with the first such payment to be made on
             11/15/03 and the remainder in 10 equal annual payments on each
             November 15th from 2004 through 2013.

    (4)    Mr. Manturuk will dismiss the case with prejudice as to Midland and will
             strike all Midland related claims as to Chaffee or dismiss with prejudice as
             to Chaffee if Allianz has also settled.

    (5)    There will be mutual general releases between Midland and Manturuk and
             a release by Manturuk of Chaffee concerning his handling of Midland
             products. The only thing to be excepted from the Midland/Manturuk
             releases are the parties obligations under this settlement agreement.

(Defendants' Ex. DX 9). No direct response to this e-mail is contained in the record currently

before the Court.

        On November 13, 2003, all counsel engaged in a telephone conversation regarding the

current state of the case. Following the conversation, Mr. Sheran drafted a letter to Ms. Zacks-

Carney, which stated, *inter alia*:

    It is my understanding from our conference call this morning that we are in
    agreement as to the following:
    1)    Mr. Manturuk's claims against Allianz Life Insurance Company of North
           America, Midland, and Chaffee will be settled and released upon the
           following terms:
           a)    The three Midland annuities and six Allianz Life annuities

currently naming his children, grandchildren and your children as annuitants, and Mr. Manturuk as beneficiary, will be changed to reflect that the proper annuitant is Edward Manturuk, and the beneficiaries will be as designated by Mr. Manturuk.

b) Mr. Manturuk may, at his option, immediately annuitize all of the Midland annuities and all of the Allianz Life annuities at their current annuitized values (as reflected in the numbers provided to you by both Mr. Hoover and myself.)

c) The only remaining issue is Mr. Manturuk's decision concerning which annuitization option he will select.

   i) We have agreed that Mr. Manturuk will advise as to his decision concerning the selected option as soon as possible, but no later than November 24, 2003.

   ii) If Mr. Manturuk should fail to have selected his option by November 24, we will proceed with his deposition beginning at 9:00 a.m. on November 24, and continuing on November 25, if necessary, at Mr. Zuppke's office. As indicated, our effort to note this deposition is not intended to derail settlement efforts, but is merely our attempt to comply with the Court's discovery scheduling order.

(Defendants' Ex. DX 10). Mr. Sheran sent the letter via facsimile to a number provided to him

by Ms. Zacks-Carney on an earlier date. The facsimile number actually is the number to TCE,

and not to Ms. Zacks-Carney's home office. Ms. Zacks-Carney had undisputedly received

facsimile transmittals at TCE in the past, but claims that she did not receive this transmittal.[3]

The Court, having had the opportunity to observe testimony and evidence presented at the May

10 and 11, 2004 hearing, does not find Ms. Zacks-Carney's claim that she did not receive the

---

[3]At the March 17, 2004 hearing, Ms. Zacks-Carney stated: "I will further represent that it is not my fax number." (3/17 Tr., p. 35). In an affidavit attached to his post-hearing brief, Plaintiff claims that TCE was having problems with its fax machine, and that it was necessary for anyone sending a facsimile to TCE to telephone ahead and have TCE plug-in the fax machine. (Manturuk Aff. ¶ 3).

letter to be credible. Ms. Zacks-Carney had received facsimile transmissions at TCE in the past, and, being that Mr. Manturuk is the owner of TCE and that he and Ms. Zacks-Carney have a relationship that extends beyond attorney and client, the Court is convinced that a facsimile transmitted to TCE was received by Ms. Zacks-Carney. Accordingly, after Ms. Zacks-Carney received the November 13, 2003 letter, she did not respond.

On November 24 and 25, 2003, Defendants conducted the deposition of Mr. Manturuk. Defense counsel did not inquire about the settlement agreements purportedly reached; instead, Mr. Manturuk was only asked general questions about Ms. Zacks-Carney's authority to settle the instant lawsuit. On December 10, 2003, Defendants filed the instant motion.

## **FINDINGS**

The Court finds that Plaintiff reached valid, binding settlement agreements with all Defendants on October 30, 2003. For the reasons that follow, Defendants are entitled to dismissal of the instant case with prejudice.

## I.      **Midland**

Ms. Zacks-Carney has already represented to this Court that Plaintiff's case against Midland was settled. (See 3.17 Tr., p. 31-32). The Court issued an Amended Order Dismissing Midland from the case with prejudice on April 5, 2004. Plaintiff argues in his post-hearing brief

18

that, while the case did settle, it became impossible for Midland to perform under the terms of the settlement agreement. The Court does not agree. Plaintiff argues that part of the settlement agreement required Midland to "re-issue" the 1997 policies showing Plaintiff as annuitant and providing Plaintiff with a ten-day "free look" period. The evidence before the Court suggests that at the time Plaintiff entered into the settlement agreement with Midland, the issuance of "new" policies was not contemplated.

Plaintiff's October 29, 2003 offer to Midland provided that, as an "exclusive point of settlement," Midland would "reform" the existing annuities to reflect Mr. Manturuk as annuitant. (Defendants' Ex. DX 3). Plaintiff contends that his use of the word "reform" meant that Midland would "re-issue" the policies. The Court does not agree. The word "reform" is defined as "to improve by altering, correcting errors, or removing defects." WEBSTER'S II NEW RIVERSIDE DICTIONARY (1988), p. 988. Thus, Plaintiff's assertion that "reform" means "re-issue" is without merit. Further, even if the word "reform" could be defined as "re-issue," Ms. Zacks-Carney's actions do not support this understanding of the term. First, the October 29, 2003 e-mail states that "in exchange for dismissing [Midland], we leave everything else 'as is' – surrender charges, pay out periods, interest rates, identity of policy owner, free-look back period, etc." (Defendants' Ex. DX 3). To leave everything else "as is" implies that the policies remain as they are, except for the change in annuitants. Second, at the March 17, 2004 hearing, the Court asked Ms. Zacks-Carney: "are you saying that the Midland defendant is done because the settlement was to *change*

19

the annuitants, and that was agreed upon?" to which Ms. Zacks-Carney replied: "That's correct, your Honor." (3/10 Tr., p. 31)(emphasis added). Accordingly, the Court finds that the offer that was accepted by Midland, namely, to reform the policies to reflect Plaintiff as annuitant, did not contemplate "re-issuance" of the policies.

Based upon its findings of fact after the two-day evidentiary hearing, the Court finds that the settlement agreement between Midland and Plaintiff contains the following terms:

1.      Midland will issue an amendment to the 1997 policies to reflect that the annuitants and beneficiaries listed in the policies were void *ab initio* and the correct annuitant is Mr. Manturuk; the correct beneficiaries will be selected by Mr. Manturuk.

2.      Mr. Manturuk has the option to immediately annuitize the Midland policies; should he choose to do so, he may select any option for payment provided for in the plans.

3.      In exchange, Mr. Manturuk will dismiss the case against Midland and against the Chaffee Defendants as to the Midland-related policies.

Accordingly, as provided for in the Court's April 5, 2004 Order, Midland is dismissed from this case with prejudice, and the Chaffee Defendants are dismissed as to all Midland-related claims.


**II.      Allianz**

Plaintiff argues that the Court is without jurisdiction to decide the motion as to Defendants Allianz and Chaffee, because the motion was brought by Midland, who has already

20

been dismissed from the case. The Court does not agree. The motion clearly states that it was brought on behalf of all Defendants; indeed, counsel for Midland signed the motion with authority from remaining counsel. Accordingly, the Court finds that it has jurisdiction to decide the instant motion.

The Court finds, based upon the facts indicated above, that Plaintiff entered into a valid settlement agreement with Allianz and the Chaffee Defendants as to Allianz-related claims. Plaintiff does not dispute that an agreement was reached; rather, Plaintiff contends that the agreement was incomplete because Plaintiff has yet to select which method will be used in paying him the annuitized value of the policies. The Court finds that this term is not a condition precedent to the settlement agreement; the settlement agreement entered into gives Plaintiff the option to annuitize the Allianz policies. Accordingly, Plaintiff may elect to annuitize the policies under one of the seven options or he may elect not to annuitize at all. The settlement agreement entered into gives him the option to immediately annuitize; Plaintiff has that option, the agreement is complete. Whether Plaintiff chooses to exercise that option is up to him; however, Plaintiff may not delay resolution of this case by claiming that which of the seven options he chooses is a material term to the settlement agreement that has not been resolved. The method of payment is not a term to the agreement; the option to annuitize is.[4] Accordingly, the Court finds that Allianz and Plaintiff entered into a valid settlement agreement, the terms of which are:

---

[4]Plaintiff does not dispute the remaining terms of the agreement.

21

1.  Allianz will change the Allianz policies to reflect Mr. Manturuk as annuitant, beneficiaries to be named by Mr. Manturuk.

2.  Mr. Manturuk is granted the option to immediately annuitize all of the Allianz annuities at their current annuitized values.

3.  Allianz will provide Mr. Manturuk with the numerical information he needs to make his decision.

4.  In exchange, Mr. Manturuk will dismiss Allianz and the Chaffee Defendants (as to Allianz-related claims) from the case.

Accordingly, the Court finds that Allianz and the Chaffee Defendants are entitled to dismissal of the instant case with prejudice, settlement on all material terms having been reached.

**CONCLUSION**

For the reasons stated above, the Court (1) GRANTS Defendants' Motion to Enforce Oral Settlement Agreements; and (2) DISMISSES the case WITH PREJUDICE.

**SO ORDERED.**

Dated:_____

    Detroit, Michigan

PAUL D. BORMAN

UNITED STATES DISTRICT COURT JUDGE